UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Gary Starr, individually and as the father and
natural guardian of Gabrielle Cotton,

    Plaintiff,

v.

Metro Systems, Inc. and Deborah Masanz,

    Defendants.

Civ. No. 01-1122 (JNE/SRN)

**FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER**

Robert J. Bruno, Esq., Bruno Law Office, appeared for Plaintiff Gary Starr.

Peter G. Van Bergen, Esq., Cousineau, McGuire & Anderson, appeared for Defendants Metro Systems, Inc. and Deborah Masanz.

Gary Starr, individually and on behalf of his daughter, Gabrielle Cotton, brought this case against his former employer, Metro Systems, Inc. (Metro), and Metro's vice president, Deborah Masanz. He alleges that Metro and Masanz (collectively, Defendants) violated the Consolidated Omnibus Budget Reconciliation Act (COBRA), 29 U.S.C. §§ 1161-1169 (2000), by failing to provide adequate notice of continuation of coverage rights after his termination. The case came before the Court for trial. Based on the evidence received at trial, the Court makes the following Findings of Fact, Conclusions of Law, and Order.

**FINDINGS OF FACT**

1. Starr is an unmarried individual. He resides at 1871 Silver Bell Road, Apartment 308, Eagan, Minnesota, with his daughter, Cotton, and his fiancé, Melody Byrne. Cotton was born on October 13, 1986. Starr has legal and physical custody of Cotton.

2. Metro is a Minnesota corporation that sells office furniture. Metro does business at 6775 Shady Oak Road, Eden Prairie, Minnesota.

3. Masanz is Metro's vice president and controller.

4. From June 9, 1997, to February 24, 2000, Starr worked as a full-time employee of Metro. He refurbished used and damaged furniture for Metro.

5. At all relevant times, Metro had an employee welfare benefit plan (Plan) as required by the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. §§ 1001-1416 (2000). Masanz was the Plan's administrator.

6. From May 1998 to February 24, 2000, Starr was enrolled in the Plan. Under the Plan, Starr received medical and dental coverage for himself and Cotton.

7. On February 24, 2000, Metro terminated Starr's employment for reasons other than gross misconduct. Masanz notified Starr of his termination that same day and has not since spoken to him.

8. The Plan required Metro to provide Starr with a form to elect to continue his and Cotton's coverage. The Plan provides:

> When a qualifying event occurs, your Employer [Metro] must give you the necessary COBRA election form within the time period specified by law. You must complete and return this form to your Employer within 60 days of the later of:
> - The date you or your Dependent would lose coverage; or
> - The date you or your Dependent receives the COBRA election forms.

9. At Metro, Masanz is the only person who sends COBRA notices. Before Starr's termination, Masanz had sent many COBRA notices. Her standard procedure to send a COBRA notice comprises: (1) create the notice with a word processor; (2) print the notice and an envelope that contains the address from the notice; (3) place the notice in the envelope; (4) affix postage using Metro's postage meter; (5) place the envelope in Metro's outgoing mail receptacle; and (6) the United States Postal Service retrieves Metro's outgoing mail.

10. On March 3, 2000, Masanz created a COBRA notice (March 3 Notice) addressed to:

Gary Starr
1871 Silverbell Road Apt #308
Eagan, MN  55112

With the exception of the zip code, the address on the March 3 Notice is correct.  The correct zip code is 55122.

11. The March 3 Notice comprises a letter and an election form.  The testimony of Mark Lanterman regarding the creation and deletion of the the letter and election form is credible.  The letter was written to Metro's server at approximately 10:14 a.m. on March 3, 2000.  That same day, Masanz created the election form on her personal computer at 10:16:27 a.m. and deleted it fourteen seconds later.  During those fourteen seconds, William Meyers, Metro's chief financial officer, either took the election form from Masanz's computer or was sent the election form by Masanz.  At 10:36 a.m., Meyers saved the election form to Metro's server in an area to which Masanz did not have access.  Meyer's involvement in the process was at odds with the standard procedure for creating and saving election forms.

12. On direct examination, Masanz testified that she followed her standard procedure to send the March 3 Notice to Starr.  On cross-examination, Masanz testified that she did not specifically recall following her standard procedure to send the notice to Starr.  The Court finds that Masanz does not recall sending the notice to Starr.

13. There is no record of the March 3 Notice actually being mailed to Starr.

14. Masanz gave conflicting testimony about how the March 3 Notice was handled after being printed on Metro letterhead.  She testified that Meyers probably had taken the March 3 Notice from her, that he had made a photocopy, and that she "did not know for years" that he

had a photocopy. She then testified that she did not know whether Meyers had taken possession of the March 3 Notice and that she did not know whether she had given him the notice. Shortly thereafter, she testified that she had made a photocopy and that she had given it to him immediately. Meyers did not testify. The Court is left uncertain as to whether Meyers took the March 3 Notice from Masanz without her knowledge or whether she gave him a photocopy. In any case, the Court finds that the March 3 Notice was not handled in accordance with Masanz's standard procedure. In addition, Metro did not handle the termination of Starr's coverage in accordance with the Plan. In the absence of an election to continue his benefits, the Plan provided that Starr's coverage terminated on March 1, 2000. Metro nevertheless extended Starr's coverage until July 1, 2000, without informing Starr of its decision to do so. Starr made claims for medical expenses incurred in March, April, and May 2000. He received coverage for these claims.

15. Based on the findings that Masanz does not recall sending the March 3 Notice to Starr, that there is no record that the March 3 Notice was sent to Starr, and that the March 3 Notice was not handled in accordance with Masanz's standard procedure, the Court finds that the March 3 Notice was not sent to Starr.

16. From August to October 2000, Starr incurred expenses in the amount of $116,728.65 for medical services provided to Cotton. Were coverage under the Plan in effect, coverage in the amount of $116,178.86 would have been provided. The monthly premium to continue coverage was $338.75.

17. By letter dated August 30, 2000, Starr informed Meyers and Masanz that Starr had not received information regarding his rights under COBRA.

18.     Masanz responded to Starr's August 30 letter on September 5, 2000. The response (September 5 Notice) consists of a short cover letter, a notice of COBRA rights, and an election form. The cover letter states that Metro's "records" indicate Metro provided Starr with notice of his COBRA rights on March 3, 2000. The cover letter describes the enclosed notice as a "duplicate copy of the notification." Again, there are no records that the March 3 Notice was sent to Starr. By "records," Masanz was referring to her recollection. As set forth above, she has no recollection of mailing the March 3 Notice to Starr. The notice enclosed with the September 5 letter was not a "duplicate copy" of the March 3 Notice. After unsuccessfully attempting to find the March 3 Notice, Masanz *created* a COBRA notice and election form from a template. Masanz mailed the September 5 Notice to Starr at the proper address.

19.     Metro never received an election form from Starr to continue his and Cotton's coverage under the Plan.

## CONCLUSIONS OF LAW

1.     COBRA provides that "each qualified beneficiary who would lose coverage under the plan as a result of a qualifying event is entitled, under the plan, to elect, within the election period, continuation coverage under the plan." 29 U.S.C. § 1161(a). The election period begins "not later than the date on which coverage terminates under the plan by reason of a qualifying event" and ends not earlier than 60 days after the later of the election period's beginning or the date of a notice under 29 U.S.C. § 1166(a)(4). 29 U.S.C. § 1165(a)(1).

2.     Starr and Cotton are qualified beneficiaries. *See* 29 U.S.C. § 1167(3).

3.     The termination of Starr's employment was a qualifying event within the meaning of 29 U.S.C. § 1163(2).

4. Upon a qualifying event within the meaning of section 1163(2), a plan administrator must notify the qualified beneficiary of his rights under COBRA within 14 days of the date on which the administrator is notified of the qualifying event. 29 U.S.C. § 1166(a)(4)(A), (c). Defendants bear the burden of demonstrating that notice was given. *See Chesnut v. Montgomery*, 307 F.3d 698, 702 (8th Cir. 2002).

5. One district court has observed that "unrefuted evidence by a plan administrator concerning adequate standard office procedures for generating and mailing COBRA notices along with unrefuted evidence showing that the procedures were followed in a given individual's case" suffices to establish the administrator's good faith compliance with COBRA notification requirements. *Keegan v. Bloomingdales, Inc.*, 992 F. Supp. 974, 979-80 (N.D. Ill. 1998).

6. Having found that the March 3 Notice was not sent to Starr, the Court concludes that Defendants failed to establish their compliance with section 1166(a)(4) and the Plan.

7. Defendants established they gave notice of Starr's rights under COBRA on September 5, 2000. The September 5 Notice, however, did not give Starr the ability to elect to continue coverage because it included a notice dated March 3, 2000.

8. Having failed to give Starr timely notice of his right to continue coverage for himself and Cotton and denied Starr the ability to elect to continue coverage, Defendants are bound to provide coverage to Starr and Cotton. *See Lincoln Gen. Hosp. v. Blue Cross/Blue Shield of Neb.*, 963 F.2d 1136, 1139 (8th Cir. 1992). The Court concludes that Defendants are liable to Starr in the amount of $113,468.86, which is the amount of medical expenses incurred from August to October 2000 less co-payments and premiums from March through October 2000.

9. Under 29 U.S.C. § 1132(c)(1)(A), a plan administrator who fails to comply with section 1166(a)(4) "may in the court's discretion be personally liable" in the amount of up to $100 per day from the date of such failure. The purpose of a statutory penalty is to punish noncompliance. *Chesnut*, 307 F.3d at 704. A defendant's good faith and the absence of harm are relevant in deciding whether to award a statutory penalty. *Id.* Neither the defendant's good faith nor the absence of harm, however, preclude a penalty's assessment. *Id*. at 703.

10. The Court is not persuaded that Defendants' failure to maintain records sufficient to establish, by a preponderance of the evidence, that timely notice was sent to Starr arose from disregard of COBRA's requirements. It appears that concerns unrelated to ERISA and COBRA led Defendants to treat Starr's termination different from an ordinary case. The Court concludes that a statutory penalty is not necessary as punishment for failing to comply with section 1166(a)(4) in this case.

## ORDER

Based on the evidence received at trial, the Findings of Fact, and the Conclusions of Law, IT IS ORDERED THAT:

1. Defendants shall pay Starr $113,468.86.

LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated: September 12, 2005

                                                s/ Joan N. Ericksen\
                                                JOAN N. ERICKSEN\
                                                United States District Judge